UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| JULIA ANNE SHEARSON, | ) | Case No.: 1:10 CV 1492 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| ERIC C. HOLDER, JR., *et al.*, | ) | |
| | ) | |
| Defendants | ) | ORDER |

Currently pending before the court in the above-captioned case is Defendants' Motion to

Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction

and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be

granted. (ECF No. 20.) Plaintiff Julia Anne Shearson ("Shearson" or "Plaintiff") brought this action

against Eric C. Holder, Robert S. Mueller, III, Timothy J. Healy, and Michael E. Leiter

("Defendants") in their official capacities as the Attorney General of the United States, Director of

the Federal Bureau of Investigation, Director of the Terrorist Screening Center, and Director of the

National Counterterrorism Center, respectively. (ECF No. 15.)[1] For the reasons that follow,

Defendants' Motion to Dismiss is granted.

---

[1]    Plaintiff filed her Complaint on July 6, 2010, (ECF. No. 1), and Defendants filed
their first Motion to Dismiss on September 28, 2010, (ECF. No. 12), before the
Amended Complaint was filed on October 18, 2010. (ECF. 15.) Defendants
subsequently filed a second Motion to Dismiss on November 19, 2010. (ECF No.
20.)The court dismisses Defendants' first Motion as moot, and decides their
second Motion in this Order.

## I.  FACTUAL AND PROCEDURAL HISTORY

Plaintiff Julia Anne Shearson is a United States citizen who serves as the Executive Director of the Cleveland Chapter of a prominent non-profit Muslim, civil rights, public relations and educational organization.  Both Plaintiff and her minor child are United States citizens.  (Am. Compl., ECF No. 15,  ¶¶ 1, 12.)  On January 8, 2006, Plaintiff and her minor child were detained for two and one-half hours by Customs and Border Protection ("CBP") agents near Buffalo, New York, upon re-entry into the United States after vacationing in Canada.  (*Id.* at ¶ 1.)  Plaintiff alleges that when her passport was scanned, an "armed and dangerous" alert appeared on the CBP computer screen.  (*Id.*)  During the detention, Plaintiff's vehicle and property were searched.  (*Id.*)  Thereafter, Plaintiff and her child were released without explanation and allowed to enter the United States.

Plaintiff wrote to her Congressional Representatives and subsequently filed a Freedom of Information Act ("FOIA")/Privacy Act request with the Department of Homeland Security ("DHS") and the CBP, seeking the reason for her detention at the U.S.-Canadian border.  (*Id.* at ¶ 2.)  Thereafter, Plaintiff filed a complaint against the DHS and CBP, alleging wrongful withholding of documents related to the border stop and seeking disclosure and release of the same.  *Shearson v. U.S. Dep't of Homeland Sec.*, No. 1:06 CV 1478, 2007 WL 764026, at *1 (N.D. Ohio Mar. 9, 2007) ("*Shearson I*") (Gaughan, J.).  In *Shearson I*, the court ordered the defendants to produce certain non-exempt documents relating to Plaintiff's border stop, denied DHS's motion for summary judgment in its entirety, granted summary judgment to CBP on Plaintiff's Privacy Act claim, and denied CBP's motion for summary judgment on Plaintiff's FOIA claim.  *Id.* at *13.  The court held that defendants were entitled to summary judgment on Plaintiff's Privacy Act claim because the

- 2 -

plain language of the Privacy Act allows an agency head to exempt itself from subsection (g), which is the civil enforcement provision. *Id.* at *12.

On November 12, 2008, Plaintiff appealed the court's grant of summary judgment on her Privacy Act claim. *Shearson v. U.S. Dep't of Homeland Sec.*, 638 F.3d 498, 499 (6th Cir. 2011). The Sixth Circuit partially vacated the district court's ruling, holding that § 552a(j) of the Privacy Act does not allow federal agencies to exempt themselves from certain civil actions under § 552a(g) and remanded *Shearson I* for consideration of Plaintiff's § 552a(b) and § 522a(e)(7) claims. *Id.* at 506. Remand proceedings are currently pending in that case. In the case before this court, Defendants maintain that Plaintiff's complaint should be dismissed in its entirety for grounds independent from the Sixth Circuit decision in *Shearson I*.

Plaintiff asserts that her FOIA request revealed documents indicating that at the time of her border stop she was on several government watchlists, including the Terrorist Identities Datamart Environment ("TIDE"), Treasury Enforcement Communications System ("TECS"), and Violent Gang and Terrorist Organization File ("VGTOF") databases. (Am. Compl., ¶ 2, n.3.) On October 14 and October 28, 2008, Plaintiff sent emails to Frank Figliuzzi, Special Agent in Charge of the Cleveland FBI, in which she claimed that her name was on the VGTOF list and inquired whether FBI agency counsel would be willing to meet with her and administratively amend her status on the VGTOF list. (Figliuzzi Letter, ECF No. 15-1, at 2.) Mr. Figliuzzi informed Plaintiff that in accordance with the United States government's policy, he was unable to confirm or deny Plaintiff's status on any watchlist, and thus, a meeting with FBI agency counsel would be "fruitless." (*Id.*) Mr. Figliuzzi then directed Plaintiff to seek redress through DHS TRIP for her alleged status on the VGTOF list. (*Id.*) Plaintiff did not seek redress through DHS TRIP. (Am. Compl., ¶ 6.)

- 3 -

Plaintiff believes that DHS TRIP does not provide a meaningful remedy for travelers who experience screening difficulties.  (*Id.* at ¶¶  6, 28–32.)

In her five-count Amended Complaint, Plaintiff alleges: (1) that her First Amendment rights have been violated because her alleged inclusion on government watchlists was proximately caused by her advocacy work and exercise of  her First Amendment rights; (2) that her Fifth Amendment rights have been violated because she was not given notice and opportunity to contest her alleged inclusion on government watchlists in violation of the Due Process Clause; (3) that her alleged placement on government watchlists represents arbitrary discrimination without a rational basis in violation of the Fourteenth Amendment's Equal Protection Clause; (4) that she is entitled to judicial review of wrongful agency action under the Administrative Procedure Act ("APA"); and (5) that she is entitled to damages under the Privacy Act for wrongful maintenance and dissemination of her records.  (*Id.* at p. 13–24.)

In response to Plaintiff's Amended Complaint, Defendants filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (Defs.' Mot. to Dismiss, ECF  No. 20, p. 1.)   Defendants' asserted grounds for dismissal include that Plaintiff lacks standing, Plaintiff's claims are not ripe for adjudication, Plaintiff has failed to exhaust her administrative remedies, and Plaintiff has failed to state a cognizable claim under the First, Fifth, and Fourteenth Amendments, the Administrative Procedure Act and the Privacy Act. (Defs.' Memo., Mot. to Dismiss, ECF. No. 20–1, p. 1–2.)

## II.  STATUTORY AND REGULATORY FRAMEWORK GOVERNMENT WATCHLISTS AND PROCEDURAL REDRESS

In 2003, President George W. Bush directed the Attorney General to establish the Terrorist Screening Center ("TSC"), an organization that would "consolidate the Government's approach to terrorism screening and provide for the appropriate and lawful use of Terrorist Information in screening processes." *Scherfen v. U.S. Dep't of Homeland Sec.,* No. 3:CV-08-1554,  2010 WL 456784, at *5 (M.D. Pa. Feb. 02, 2010) (quoting Homeland Sec. Presidential Directive 6, http://www/dhs/gov/xabout/laws/gc_1214594853475.shtm#1 (last visited July 8, 2010)) (internal quotation marks omitted). The TSC is a division of the Federal Bureau of Investigation ("FBI"), with the support of the Department of Homeland Security ("DHS"), the Department of Justice and other agencies, whose purpose is to maintain a consolidated terrorist watchlist, also known as the Terrorist Screening Database ("TSDB"). (Am. Compl., ¶¶ 13, 15;  Defs.' Memo., p. 3.); *see also Scherfen,* 2010 WL 456784, at *5. The TSDB is a single database of identifying information about those known individuals or reasonably suspected of being involved in terrorist activity. (Am. Compl., ¶ 14; Defs.' Memo., p. 13.) The data provided through the TSDB enables front-line screening agencies to identify known or suspected terrorists attempting to obtain visas, enter the United States, or board planes. (*Id*. at p. 3–4)

Congress recognized that the TSDB-nomination procedure carries with it the potential for wrongful identification of persons as security threats. In doing so, Congress instructed the DHS to create a "timely and fair" appeal and redress process for individuals who believe they were "wrongly identified as a threat." *See* 49 U.S.C. § 44926 (2007). Subsequently, the DHS established the Traveler Redress Inquiry Program ("DHS TRIP"), the primary administrative process for individuals who have inquiries about their status or those who seek redress of difficulties experienced during travel screening at transportation hubs or crossing national borders. These difficulties include:

watchlist issues, screening problems at ports of entry, and occasions where travelers believe they have been unfairly or incorrectly delayed, denied boarding, or identified for additional screening. *Scherfen*, 2010 WL 456784, at *6 (citing DHS TRAVEL REDRESS INQUIRY PROGRAM, http://www.dhs.gov/files/programs/gc_1169676919316.shtm (last visited July 8, 2011)).

James Kennedy, Director of the DHS's Office of Transportation and Security Redress, explains that because multiple federal departments and agencies play a role in the screening process used by Customs and Border Patrol ("CBP"), the Transportation Security Administration ("TSA"), and others, DHS TRIP serves the important function of providing a single, formal administrative redress process for the wide variety of travel issues listed above. (Kennedy Decl., ECF No. 12-2, ¶ 7.)  Travelers who seek redress through DHS TRIP complete a Traveler Inquiry Form and are asked to send additional supporting information to DHS TRIP. (*Id.* at ¶  8.) After completing the Inquiry Form, travelers are automatically issued a Redress Control Number, which matches travelers with the results of their DHS TRIP case. (*Id.* at ¶ 9.) Redress Control Numbers can also be submitted by travelers when making airline reservations, which may prevent unnecessary screening.  (*Id.*)

From this single inquiry, DHS TRIP works with other government agencies, including the TSA and CBP, to determine whether the person is experiencing difficulties based on his or her status on a watchlist. (*Id.* at ¶ 10.) If the traveler's name is the same as, or is similar to, another individual on the watchlist, then the traveler has been misidentified, and the DHS TRIP and other agencies involved will work together to address the misidentification by amending information in the traveler's record. (*Id.*) Thereafter, DHS TRIP will issue a determination letter which provides information to the traveler without revealing whether the traveler has been placed on a watchlist. (*Id.*) The Government does not reveal whether or not an individual is on a watchlist because

- 6 -

disclosing this information would undermine the purpose of terrorist watchlists, which is to provide the Government with information about security threats without alerting security threats of the Government's knowledge. *See Scherfen,* 2010 WL 456784, at *5 ("[T]he agencies and persons involved in the creation of the TSDB will neither confirm or deny whether an individual is on a particular list or in the TSDB."). On the other hand, if the traveler is positively identified as an individual included in the TSDB, DHS TRIP refers the matter to the TSC's Redress Unit. (Kennedy Decl., ¶ 11.) The Redress Unit works directly with intelligence agencies, such as the FBI and the National Counterterrorism Center ("NCTC"), to review the underlying intelligence that led to the individual's placement on the TSDB and to make any appropriate amendments to the individual's watchlist status. (*Id.*) When appropriate, the individual may be removed from the TSDB consolidated watchlist. (*Id.*) At the conclusion of the review, the TSC Redress Unit notifies the DHS TRIP of the outcome and DHS TRIP issues a determination letter to the traveler. (*Id.*) Again, the determination letter will not inform the individual of his or her status on a watchlist. Despite the DHS TRIP policy of non-disclosure of travelers' watchlist status, the program's goal is to prevent individuals from experiencing the same type of travel-related difficulties in the future. (*Id.* at ¶¶ 12–13.)

### III.  MOTION TO DISMISS STANDARD

#### A.  12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

A motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) may take the form of either a facial or a factual attack. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  Facial attacks challenge the sufficiency of the pleadings

themselves. *Id.* Factual attacks, on the other hand, challenge the factual existence of subject matter jurisdiction, regardless of what is or might be alleged in the pleadings. *Id.*

When adjudicating a motion to dismiss based upon a facial attack, the Court must accept all material allegations of the complaint as true and must construe the facts in favor of the non-moving party. *Ritchie*, 15 F.3d at 598 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235–37 (1974)); *see also Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) (holding that all reasonable inferences must be drawn in favor of the plaintiff when evaluating a facial attack on subject-matter jurisdiction).

In contrast, a factual attack contests the validity of the facts alleged as support for subject-matter jurisdiction. *Ritchie*, 15 F.3d at 598. With a factual challenge, no presumption of truthfulness arises for either party, and the court must weigh the evidence to determine its power to hear the case. *Id.* (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir.1990)). The court may consider both the pleadings and evidence not contained in the pleadings. *Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000).

### B.  12(b)(6) Motion to Dismiss for Failure to State a Claim

The court examines the legal sufficiency of the plaintiff's claim under Federal Rule of Civil Procedure 12(b)(6). *See Mayer v. Mulod*, 988 F.2d 635, 638 (6th Cir. 1993).  The Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and recently in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949–50 (2009) clarified the law regarding what the plaintiff must plead in order to survive a Rule 12(b)(6) motion.

When determining whether the plaintiff has stated a claim upon which relief can be granted, the court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The plaintiff's obligation to provide

the grounds for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the Complaint are true." *Id.* A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court in *Iqbal*, 129 S.Ct. at 1949, further explains the "plausibility" requirement, stating that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Furthermore, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." *Id.* This determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

The Sixth Circuit has held that a court may consider allegations contained in the complaint, as well as exhibits attached to or otherwise incorporated in the complaint, all without converting a Motion to Dismiss to a Motion for Summary Judgment.  Fed. R. Civ. P. 10(c); *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997).

## IV.  LAW AND ANALYSIS

### A. Fifth Amendment Procedural Due Process Claim

### 1. Standing

Defendants challenge Plaintiff's standing to bring her claims seeking prospective declaratory and injunctive relief. Under Article III of the U.S. Constitution, standing is a threshold requirement for a court to hear all cases and controversies, and thus implicates the issue of subject matter

jurisdiction. *See Horne v. Flores*, 129 S.Ct. 2579 (2009); *Flast v. Cohen*, 392 U.S. 83 (1968). In order to establish standing, Plaintiff must claim a personal injury caused by Defendants' alleged violations of law which is likely to be remedied by the requested relief. *Allen v. Wright*, 468 U.S. 737, 751 (1984). Injury sufficient to confer standing on a plaintiff must be an "injury in fact" or an "invasion of a legally protected interest" which is defined as an injury that is "concrete and particularized," "actual and imminent" and is not merely "conjectural" or "hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *City of L.A. v. Lyons*, 461 U.S. 95, 101–102 (1983). The party invoking federal jurisdiction has the burden to prove a concrete and particularized, actual and imminent, injury in fact. *Lujan*, 504 U.S. at 56. These requirements of standing are not simple pleading requirements, but instead are an "indispensable part of the plaintiff's case." *Id.* A plaintiff "must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006). Further, "a plaintiff must demonstrate standing separately for each form of relief sought." *Laidlaw*, 528 U.S. at 185 (citing *Lyons*, 461 U.S. 95, 109). Whether a plaintiff has standing to bring a claim for removal of her name from a government watch list is "highly fact-dependent," and thus, the district courts are in the best position to resolve these claims in the first instance. *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1256, n.9 (9th Cir. 2008).

Defendants contend there are two separate bases for finding that Plaintiff lacks standing. First, Defendants argue that Plaintiff lacks standing because her complaint "fails to allege an invasion of any 'legally protected interest.'" (Defs.' Memo., p. 8.) In particular, Defendants argue that "Plaintiff has no legally protected interest in being free from a two and a half hour stop when crossing into the United States from Canada," and that further, "travelers have no right to be free from searches of their vehicles or personal effects at the border," where the government's interest in security is at its zenith. (*Id.* at 8–9.) Alternatively, Defendants argue that "mere placement on a

government watchlist in and of itself (particularly a non-public watchlist), does not constitute a legally cognizable injury." (*Id.* at 9,  n. 6.)

The court disagrees with the Defendants' analysis of the alleged injury in this case. Defendants' first argument relies on Fourth Amendment jurisprudence dealing with challenges to border searches and seizures. Plaintiff, however, is not solely challenging the legality of the January 8, 2006 detention at the U.S.–Canada border, as in a motion to suppress. Rather, the heart of Plaintiff's Complaint is that by wrongfully placing her on terrorism-related watch lists, Defendants have infringed on her "right to be free from false governmental stigmatization as an individual associated with terrorist activity" and have thereby deprived her certain liberty interests. (Am. Compl., ¶¶ 47–48.) Plaintiff further alleges that her place in the watchlists "prevents her from traveling freely and subjects her to imminent harm of being subject to domestic intelligence collection for protected Constitutional activities." (*Id.* at ¶ 52.)

Defendants' argument that mere placement on a government watchlist does not constitute a legally cognizable injury also misses the mark. As an initial matter, Plaintiff here contends that her name has been *erroneously* placed on government watchlists. That certainly is a wrong that confers Article III standing. *See Tooley v. Napolitano*, 556 F.3d 836, 840 (D.C. Cir. 2009), rev'd *Tooley v. Napolitano*, 586 F.3d 1006 (D.C. Cir. 2009) (affirming plaintiff established Article III standing on claim that he was wrongfully placed on terrorist watch lists).  In support of their standing argument, Defendants erroneously rely on cases applying *Paul v. Davis*, 424 U.S. 693 (1976), wherein the Supreme Court defined the "stigma-plus" test used to analyze procedural due process claims where state action injures the plaintiff's reputation. Under this line of cases, "[a]successful plaintiff must . . . show that the state's action both damages his or her reputation (the stigma)" and that it deprived him or her of a protected liberty or property interest. *Doe v. Michigan Dept of State Police*, 490 F.3d

- 11 -

491, 501–02 (6th Cir. 2007). Those cases, however, deal not with the question of standing, but rather with the question of whether plaintiff has stated a claim upon which relief can be granted. *See, e.g.*, *Almahdi v. Ridge*, 201 Fed. App'x 865, 868–69 (3d Cir. 2006) ("Even assuming that Almahdi suffers a stigma because his name is on the [DHS] watchlist, he does not state a claim because he does not suffer a concomitant deprivation of a liberty or a property right.")

Second, Defendants argue that even assuming Plaintiff has alleged an injury to a legally protected interest in the past, that prior injury does not confer standing in the instant action where Plaintiff is seeking *prospective* injunctive relief. (Defs.' Memo., p. 9.) Defendants argue that a plaintiff seeking prospective injunctive relief "must establish 'a real and immediate threat' of *future* harm." (*Id.* at 10) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). Defendants argue Plaintiff's prayer for injunctive and declaratory relief is based on allegations that are insufficient to establish standing because, "any continuing, present adverse effects from the 2006 border stop are speculative."

In *Lyons*, the Supreme Court held that past alleged injuries do not confer standing where the plaintiff is seeking injunctive relief. 461 U.S. 95, 102 (1983). The Supreme Court noted that "past exposure to illegal conduct does not itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). In *Lyons*, the plaintiff alleged that he was injured by police officers who seized him and applied a "choke hold" after Lyons was pulled over for a traffic violation. *Id.* at 97–98. Lyons sued the municipality, seeking an injunction preventing the City from using choke holds in certain cases. *Id.* The Supreme Court rejected the plaintiff's claim that his fear of any future contact with the Los Angeles Police could have "result[ed] in his being choked and strangled to death without provocation, justification, or other legal excuse," and thus was a real

and immediate injury sufficient to establish standing. *Id.* at 98, 105–06. In order to satisfy standing, the plaintiff would need to demonstrate that he would likely be stopped again by the police, and also he would be choked by police without any provocation or legal excuse. *Id.* at 106, n.7.

In the instant case, Defendants' reliance on *Lyons* is misplaced. As noted above, Plaintiff's Complaint does not merely challenge the 2006 detention at the border. Rather, Plaintiff is challenging an alleged erroneous placement on government watchlists, an effect of which was the 2006 detention at the U.S.–Canada border. So long as she is erroneously listed on these watchlists, she may be subject to enhanced screening and possible detention, and thus she can seek prospective relief in federal court. *Scherfen*, 2010 WL 456784 at *7 ("The complaint thus supports a fair inference that Plaintiffs have experienced intensified screening as a result of inclusion in the TSDB, indicating that the alleged harm could be avoided by the requested injunctive relief.").

Further, Defendants rely on *Scherfen* for the proposition that Plaintiff lacks standing to seek declaratory and injunctive relief, but the facts of that case do not support their argument. In *Scherfen*, the plaintiffs similarly brought an action for declaratory and injunctive relief challenging their inclusion on watch lists and in the TSDB. *Id.* at *1. As a result of being placed on these watch lists, one of the plaintiffs, a commercial pilot, was placed on administrative leave by his employer and forced to surrender his pilot identification card. *Id.* at *2. Prior to filing challenges in federal court, plaintiffs invoked the DHS TRIP process requesting to be removed from the watchlists. *Id.* Based on its *in camera* review of documents produced through this administrative review process, however, the court held that plaintiffs lacked standing to maintain their action for prospective injunctive and declaratory relief.[2] *Id.* at *8. Further, the court pointed to positive developments on

---

[2]     Because the TSDB status of a particular individual can neither be confirmed nor denied, the court did not discuss the contents of the documents submitted for *in camera* review. However, the court noted that "[u]pon request of either party . . . this Court will prepare a separate opinion that sets forth the contents of the

- 13 -

behalf of the person seeking relief that raised questions as to whether meaningful injunctive relief remained available in the case, including the "reinstatement of Mr. Scherfen's flight status by his employer." *Id.* at *7–*8. In this case, there are no such indicators that Plaintiff's status and name have been cleared, and thus as noted above, the alleged harm could be remedied by the requested relief.

### 2. Ripeness and Exhaustion of Remedies

Defendants next argue that even assuming Plaintiff has standing, her claims should nevertheless be dismissed because they are not yet ripe for adjudication in federal court. Alternatively, Defendants argue that Plaintiff's claims should be dismissed in their entirety as a prudential matter because Plaintiff has failed to exhaust her remedies. The court agrees with Defendants insofar as Plaintiff's Fifth Amendment procedural due process claim is premature and therefore dismisses this claim for failure to exhaust administrative remedies.

It is true that the "exhaustion of administrative remedies may not be required in cases of non-frivolous constitutional challenges to an agency's procedures." *S. Ohio Coal Co. v. Office of Surface, Mining, Reclamation & Enforcement*, 20 F.3d 1418, 1425 (6th Cir. 1994). Defendants concede that there is no express statutory requirement of administrative exhaustion in this context. However, according to the Supreme Court in *McCarthy v. Madigan*, "where Congress has not clearly required exhaustion, sound judicial discretion governs" whether or not to apply the doctrine of exhaustion. *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992); *Bangura v. Hansen*, 434 F.3d 487, 494 (6th Cir. 2006); *Dixie Fuel Co. v. Comm'r of Soc. Sec.*, 171 F.3d 1052 (6th Cir. 1999).  The *Madigan* Court described the purposes of the exhaustion doctrine as follows:

---

documents and explains more directly why Plaintiffs do not have standing." *Id.* at *8, n. 5.

> The exhaustion doctrine recognizes the notion, grounded in deference to Congress' delegation of authority to coordinate branches of government, that agencies, not the courts, ought to have primary responsibility for the programs that Congress charges them to administer . . . The exhaustion doctrine also acknowledges the commonsense notion of dispute resolution that an agency ought to have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court.

503 U.S. at 145.  In other words, when deciding whether exhaustion applies, a court must give deference to Congressional authority and give agencies an opportunity to correct errors in their own programs before applying judicial scrutiny. *Id.*; *see also Hansen*, 434 F.3d at 494 (holding that Congressional intent is "of paramount importance to an exhaustion inquiry"). Additionally, exhaustion principles apply "with particular force" when the agency action in question involves: the "exercise of the agency's discretionary power"; the agency's "special expertise"; and the "frequent and deliberate flouting of administrative processes [which] could weaken an agency's effectiveness by encouraging disregard of its procedures." *Madigan*, 503 U.S. at 145.

As noted above, pursuant to 49 U.S.C. § 44926, Congress directed the DHS to

> establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by the Transportation Security Administration, United States Customs and Border Protection, or any other office or component of the Department of Homeland Security.

While the terms of the statute speak to procedures for commercial aircraft passengers, the procedure ultimately created by DHS–DHS  TRIP–provides redress for travelers who have been denied or delayed airline boarding, entry into or exit from the United States, or repeatedly have been subjected to additional screening. *Scherfen*, 2010 WL 456784, at *6. As discussed above, DHS TRIP will not provide travelers with a traditional hearing, but will work with its constituent agencies to review a traveler's claims and remedy any erroneous information.  When appropriate, the review will likely

result in the removal of an individual's name from the TSDB and its derivative lists (such as the VGTOF). As the court discussed in *Scherfen*, judicial review of orders related to security duties and powers delegated to the TSA, including TRIP determination letters, may be obtained pursuant to 49 U.S.C. § 46110(a). Section 46110(a) provides that parties "disclosing a substantial interest" in such TSA orders may file a petition for review in the United States Court of Appeals for the D.C. Circuit or in the Court of Appeals for the circuit in which the person resides or has its principal place of business.

In the instant case, Plaintiff admits in her Amended Complaint that she did not seek DHS TRIP redress because DHS TRIP does not provide a meaningful opportunity to challenge her status on the VGTOF list or the underlying intelligence that resulted in her inclusion on watchlists. (Am. Compl., ¶ 6.) Here, because Plaintiff has not availed herself of DHS TRIP, Plaintiff has not afforded the various federal agencies charged with correcting any errors the opportunity to formally review Plaintiff's claims and to make any changes to her records, if necessary. *See McCarthy*, 503 U.S. at 145 (dismissal of action as premature would serve the underlying purpose of exhaustion by allowing "agencies, not the courts, [ ] to have primary responsibility for the programs that Congress has charged them to administer").The court agrees with Defendants that allowing Plaintiff to sidestep DHS TRIP would significantly undermine the program itself and Congress' intent in creating the program. *See Howard v. Solis*, 570 F.3d 752, 758 (6th Cir. 2009) (citing *McCarthy*, 503 U.S. at 145) ("'[F]requent and deliberate flouting of administrative processes' could weaken an agency's effectiveness by encouraging disregard of its procedures.").

Further, requiring exhaustion of administrative remedies in this case will promote judicial efficiency. According to the *McCarthy* Court, exhaustion promotes judicial efficiency in two ways. *McCarthy*, 503 U.S. at 145. First, "[w]hen an agency has the opportunity to correct its own errors,

a judicial controversy may well be mooted, or at least piecemeal appeals may be avoided." *Id.*; *See e.g.*, *Parisi v. Davidson*, 405 U.S. 34, 37 (1972); *McKart v. United States*, 395 U.S. 185, 195 (1969). Second, "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration, especially in a complex or technical factual context." *McCarthy*, 503 U.S. at 145; *see also Weinberger v. Salfi*, 422 U.S. 749, 765 (1975). The test for determining how much process an administrative agency owes under the circumstances "requires analysis of the governmental and private interests that are affected," *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976), and thus, a reviewing court would benefit from a fully developed factual record. By not seeking relief through DHS TRIP, the court has no administrative record from TSC that would be helpful in adjudicating the merits of this complex case. There is also a possibility that use of DHS TRIP would render the current action moot.

After Plaintiff has satisfied the administrative requirement of seeking DHS TRIP redress, she may have grounds for review by the court if she experiences future travel-screening difficulties, but at this juncture, the court must refuse to review the merits of Plaintiff's procedural due process claim and accordingly dismisses Count II.

### B.  First Amendment and Equal Protection Claims

In Count I of her Amended Complaint, Plaintiff asserts that her constitutional rights have been violated because, as the Executive Director of a "civil rights advocacy organization," she has engaged in various First Amendment activities and her exercise of these rights "can be construed as a relevant and substantial factor in causing the Plaintiff to be put on the VGTOF list by the FBI." (Am. Compl., ¶ 43.)  Plaintiff similarly alleges in Count III that she has been denied equal protection because, "[a]lthough it is impossible to know why one is on the [terrorist watchlist] . . . [she] may be on the list because she is an activist in her community and is critical of certain

government policies in the 'War on Terrorism.'" (Am. Compl., ¶ 56.) Insofar as Plaintiff's Equal

Protection Clause claim is based on alleged violations of her First Amendment rights, the court will

consider these claims jointly. *See, e.g.*, *McGuire v. Ameritech Servs.*, 253 F. Supp. 2d 988, 1000–01

(S.D. Ohio 2003) (finding that where plaintiff's equal protection claim is "premised on an alleged

violation of [her] fundamental right to free speech and association," the analysis under either

constitutional provision is the same). On both counts, Plaintiff has failed to establish a prima facie

case of a constitutional violation.

To establish a prima facie case of retaliation under the First Amendment, a plaintiff must

show that the defendants took an adverse action against plaintiff and that this action was "motivated

at least in part as a response to the exercise of the plaintiff's constitutional rights." *Paige v. Coyner*,

614 F.3d 273, 277 (6th Cir. 2010); *see also Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001).

Here, Plaintiff fails to meet her prima facie burden on the element of causation. In *Ashcroft v. Iqbal*,

129 S.Ct. 1937 (2009), the Supreme Court set forth what is required for a plaintiff to state a

plausible claim for relief under the Federal Rules of Civil Procedure. There, Plaintiff Iqbal, a

Pakistani Muslim, alleged that the federal government arrested and detained thousands of Arab

Muslim men as part of its investigations of the September 11 attacks and, as part of this policy,

designated Iqbal as a person of high interest and subjected him to harsh conditions of confinement

on account of his religion and race in violation of the First and Fifth Amendments. *See Iqbal*, 129

S.Ct. at 1949–52. The Court concluded that Iqbal failed to allege a plausible claim for relief because

his claims were simply "bare assertions" that "amount to nothing more than a 'formulaic recitation

of the elements' of a constitutional discrimination claim" that were "conclusory and not entitled to

be assumed true." *Id.* at 1951 (citing *Twombly*, 550 U.S. at 554–555). Specifically, the Court found

that although Iqbal pled facts concerning his race and religion, as well as the conditions of his

- 18 -

confinement, his complaint did not "contain facts plausibly showing that [defendants] purposefully adopted a policy of classifying post-September-11 detainees as 'of high interest' because of their race, religion, or national origin." *Id.* at 1952.

The same is true here. Plaintiff has done nothing more than label the protected activity in which she was engaged (being an "activist" who is critical of government policies) and the alleged adverse action by Defendants (placing Plaintiff on a government watchlist which caused her to be subjected to additional inspection at the border on one occasion), and from that she has concluded that the latter conduct was taken in retaliation for the former conduct. (Am. Compl., ¶¶ 34–41, 43.) Plaintiff cites a DOJ Inspector General report reviewing FBI investigative activity relating to five specific groups or individuals, but it makes no reference to Plaintiff's conduct or group. (*Id.* at ¶ 42.) Thus, the DOJ-IG report does not support any inference that Plaintiff was included on a terrorist watchlist because of her activism**.** Because the presentation of "labels and conclusions" or the "formulaic recitation of the elements of a cause of action" are insufficient to establish a prima facie claim, the court dismisses Plaintiff's First Amendment claim. *Twombly*, 550 U.S. at 555.

Plaintiff's Equal Protection Clause claim fails for similar reasons. As stated in Count III of the Amended Complaint, Plaintiff's Equal Protection Clause claim is based on an alleged violation of her fundamental rights to free speech and association under the First Amendment, which is also stated in Count I. (Am. Compl., ¶¶ 56–57.) Here, Plaintiff's allegations fall short of the minimal standards for stating a class-based equal protection claim. Under the Equal Protection Clause, the government cannot "target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005)."Fundamentally, the Clause protects against invidious discrimination

among similarly-situated individuals or implicating fundamental rights." *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).

The Sixth Circuit has explained that "[t]he threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Id.* Plaintiff simply alleges that she is an activist who is critical of the government, and that she has been placed on a government watchlist. Even if both these claims are taken as true, these allegations would be "merely consistent" with an equal protection claim—they do not themselves make out an equal protection claim, let alone a plausible one. *See Iqbal*, 129 S.Ct. at 1949. Plaintiff does not allege that the inclusion of individuals on a government watchlist is limited to individuals like herself. Instead, Plaintiff makes generalized claims that various groups of people, including "Muslims, Arabs, and South Asians," are on such lists, as well as "peace activists, protestors, government critics, animal rights activists, gun rights advocates, religious leaders, Quakers, environmentalists, etc." (Am. Compl., ¶ 57.) But "bald accusations and irrelevant generalized statistics do not even come close to constituting what is necessary to establish a *prima facie* case of an equal protection violation." *United States v. Nichols*, 512 F.3d 789, 795–96 (6th Cir. 2008). Because Plaintiff has not shown disparate treatment, her claim of discrimination under the Fifth Amendment is also dismissed.

### C. The Administrative Procedure Act

The U.S. Supreme Court has held that it is "axiomatic that the United States may not be sued without its consent and that existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). In this case, Plaintiff relies on 5 U.S.C. § 702 which contains a waiver of sovereign immunity and a right of judicial review when a person suffers a "legal wrong because of agency action." In order to have standing to assert a right of judicial review under the

APA, a plaintiff must satisfy the prudential standing requirement in addition to the constitutional requirement that a plaintiff must have suffered an injury in fact. *Bennett v. Spear*, 520 U.S. 154, 162 (1997); *AFGE v. Babitt*, 46 F. App'x 254, 256 (6th Cir. 2002) ("Prudential standing under § 10(a) of the [APA], 5 U.S.C.S. § 702, exists if the interest that the plaintiff seeks to protect is arguably within the zone of interests to be protected or regulated by the statute in question.").

However, under § 701(a)(2), § 702 does not apply when the "agency action is committed to agency discretion by law." *See Heckler v. Chaney*, 470 U.S. 821, 828 (1985) (holding that § 701(a) must be satisfied before judicial review of agency action). The agency discretion exception is a very narrow one. *Citizens to Pres. Overton Park, Inc.  v. Volpe*, 401 U.S. 402, 410 (1971). Agency action is "committed to agency discretion" when "statutes are drawn in such broad terms that in a given case there is no law to apply." *Id*. When there are no available judicially manageable standards for "judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" *Heckler*, 470 U.S. at 830.

Even if Plaintiff had sufficiently shown that she had suffered an injury in fact and that she was within the zone of interests protected by the APA to have standing, Plaintiff has not alleged that a judicially manageable standard exists for reviewing Defendants' inclusion of persons on the TSDB or a derivative watch list. Nor is there any statute that provides a standard of review. Instead, Defendants' authority to create and maintain watchlists is derived from the President's Executive powers and Defendants' general authority to secure the national borders. *See, e.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (citing *Webster v. Doe*, 486 U.S. 592 (1988)) ("[Section 701(a)(2) of the APA] precludes judicial review of a decision by the Director of the Central Intelligence to terminate an employee in the interests of national security, an area of executive action 'in which courts have long been hesitant to intrude.'"); *Diebold v. U.S.*, 947 F.2d 787, 790 (6th Cir. 1991) ("The Court has

. . . narrowly defined the [APA] exception, 'committed to agency discretion,' to include cases involving prosecutorial discretion, and cases which implicate national security." (citations omitted)); *Beno v. Shalala*, 30 F.3d 1057, 1066–67 (9th Cir. 1994) (citing *Webster*, 486 U.S. at 600). Because the initial determination of which individuals may warrant additional security inspection at our nations borders is a matter that is committed to the discretion of the law enforcement agencies involved in the intelligence evaluation and screening processes, chapter 7 of the APA—including Section 702's waiver of sovereign immunity—does not apply in this case.

As Defendants note, once the relevant agencies have formally reviewed this initial determination through the DHS TRIP Redress process, the court may then review the adequacy of the DHS TRIP Redress process itself. *See Infante v. Drug Enforcement Admin.*, 938 F. Supp. 1149, 1154 (E.D.N.Y.1996) (finding that although the underlying agency actions are "committed to discretion, and as such are not themselves subject to judicial review under the APA, federal court review is not foreclosed where the petitioner does not challenge the exercise of the agency's discretion, but instead challenges "the adequacy of the notice of the proceeding itself."). Accordingly, the court dismisses Plaintiff's APA claim pursuant to Rule 12(b)(6).

### D. Privacy Act Claims

Plaintiff alleges that Defendants violated the Privacy Act by maintaining records of her "travel and First Amendment protected activities" in violation of 5 U.S.C. § 552(e)(7), (Am. Compl., ¶ 65), and by disseminating records about her in violation of 5 U.S.C. § 552a(b). (Am. Compl., ¶ 64.) Plaintiff prays for a declaratory judgment that Defendants' "policies, practices, and customs" violate the Privacy Act, and further, she seeks damages for Privacy Act violations pursuant to 5 U.S.C. § 552(a)(g)(4). (Am. Compl., p. 23–24.) Defendants argue that this court lacks jurisdiction over Plaintiff's Privacy Act claims because they are time barred. (Defs.' Memo., p.

29–31.) Alternatively, Defendants argue that if the limitations period is not jurisdictional, Plaintiff's Privacy Act claims should nevertheless be dismissed pursuant to Rule 12(b)(6) or under the doctrine of *res judicata*. (*Id.* at 31–33.) Defendants further argue, that even if Plaintiff's claims are properly before the court, Plaintiff has nevertheless failed to state a claim of improper maintenance or disclosure and to make a *prima facie* claim for damages under the Act. *Id.* at 33–40.

For the reasons outlined below, the court finds that Plaintiff's Privacy Act claims are time barred, and that in any event, Plaintiff has failed to state a claim upon which relief can be granted. Accordingly, Plaintiff's Privacy Act claims are dismissed.

### 1. Statutory Framework

The Privacy Act regulates the "'collection, maintenance, use, and dissemination of information'" about individuals by federal agencies. *Doe v. Chao*, 540 U.S. 614, 618 (2004). The Act prohibits disclosure of "any record which is contained in a system of records by any means of communication to any person, or to another agency," subject to several exceptions. 5 U.S.C. § 552a(b). The Act further imposes certain requirements regarding the maintenance of records, 5 U.S.C. § 552a(e)(5), including that an agency shall not maintain records describing an individual's First Amendment activities unless pertinent and within the scope of authorized law enforcement activity. 5 U.S.C. § 552a(e)(7). The Privacy Act provides for a private cause of action against an agency for certain violations of the Act, including improper maintenance and disclosure claims. 5 U.S.C. § 552a(g)(1). Actions to enforce liability under the act may be brought "within two years from the date on which the cause of action arises." 5 U.S.C. § 552a(g)(5). In cases alleging violations of § 552a(b) or § 552a(e)(7), an individual may pursue damages under the Act, but the court must determine that "the agency acted in a manner which was intentional or willful." 5 U.S.C.

§ 552a(g)(4).  Exhaustion of remedies is not required for damages suits under the Privacy Act. *Diederich v. Dep't of Army*, 878 F.2d 646, 647–48 (2d Cir. 1989)**.**

### 2. Statute of Limitations

Pursuant to the Privacy Act, 5 U.S.C. § 552a(g)(5), "[a]n action to enforce liability under this section . . . may be brought within two years from the date on which the cause of action arises." The statute of limitations begins to run when the plaintiff knows or should have known about the alleged violation.  *Lockett v. Potter*, 259 F. App'x 784, 787 (6th Cir. 2008); *Oja v. U.S. Army Corps of Engineers*, 440 F.3d 1122, 1135 (9th Cir. 2006); *Davis v. United States Dep't of Justice*, 204 F.3d 723, 726 (7th Cir. 2000); *Tijerina v. Walters*, 821 F.2d 789, 797–98 (D.C. Cir. 1987); *Bergman v. United States*, 751 F.2d 314, 316 (10th Cir. 1984). Section 552a(g)(1) grants a private right of action "against *the* agency" alleged to be in violation of the Act. (emphasis added); *see also Windsor v. The Tennessean*, 719 F.2d 155, 160 (6th Cir. 1983). Thus, the cause of action accrues when plaintiff "knows or should have known" that a *particular agency* is in violation of the Act. An exception to the limitations period may arise when "an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section." 5 U.S.C. § 552a(g)(5). In that circumstance, the plaintiff may bring an action within two years of his discovery of the misrepresentation. *Id.*

There is a split in the circuits as to whether the Privacy Act's statute of limitations is jurisdictional in nature. The Seventh and Tenth Circuits have held that a plaintiff's failure to file suit within the Act's limitations period deprives courts of subject matter jurisdiction over the suit. *See Diliberti v. United States*, 817 F.2d 1259, 1262 (7th Cir. 1987); *Harrell v. Fleming*, 295 F.3d 1292, 1293 (10th Cir. 2002). The District of Columbia Circuit and the Ninth Circuit, on the other hand,

take the opposite view in light of the Supreme Court's decision in *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990). *See Chung v. US Dep't of Justice*, 333 F.3d 273, 278 (D.C. Cir. 2003); *Rouse v. United States Dep't of State*, 567 F.3d 408, 415–16 (9th Cir 2009). In *Irwin*, a Title VII case, the Supreme Court announced that as a general rule, "the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States." *Irwin*, 498 U.S. at 95–96. Following *Irwin*, courts have held that for the *Irwin* presumption to apply, "the type of litigation at issue must not be so peculiarly governmental that there is no basis for assuming customary ground rules apply." *Chung*, 333 F.3d at 277; *see also United States v. Brockamp*, 519 U.S. 347, 350 (1997) (finding tax refund suit and private suit for restitution "sufficiently similar" to warrant application of *Irwin* presumption). This court agrees with the courts that have adopted the *Irwin* approach and have held that Privacy Act claims are sufficiently similar to privacy tort claims to trigger the application of the *Irwin* rule. Because the court finds that the statute of limitations is not jurisdictional, the Court declines to decide the Defendants' Motion under 12(b)(1).

Alternatively, Defendants seek dismissal on the statute of limitations ground pursuant to Rule 12(b)(6). The statute of limitations defense "may be raised on a motion to dismiss under Rule 12(b)(6) when it is apparent from the face of the complaint that the time limit for bringing the claim has passed." *Hoover v. Langston Equip. Assoc., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992). In general, a court may not consider facts outside the complaint and any exhibits attached to a motion to dismiss for failure to state a claim. *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001). However, a court may consider public records, matters of which a court may take judicial notice. *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999).

In the instant case, Defendants argue that the date of accrual was January 8, 2006, when she was briefly detained at the U.S.–Canada border. (Defs.' Memo., p. 30.) On that occasion, however, Plaintiff alleges that her interaction was with CBP, a component of the DHS, not with the FBI. (Am. Compl., ¶ 1.) Following this encounter, Plaintiff filed a FOIA and Privacy Act suit against DHS and CBP on June 15, 2006. (*Id.* at ¶ 2.) In her Complaint, Plaintiff alleged that as a result of the FOIA litigation in *Shearson I*, she was provided documents by counsel for CBP/DHS on July 7, 2008, and that upon review of those documents, she "learned for the first time that she is specifically listed as a 'POSITIVE VGTOF,'" which she subsequently learned was "an intelligence database maintained by the Federal Bureau of Investigation." (*Id.* at ¶ 3.) Plaintiff alleges that "[p]rior to receiving the July 2008 documents Plaintiff had no idea what agency had entered her into the VGTOF list and thus could not lodge a Privacy Act claim against the originating/nominating agency." (*Id.* at ¶ 70.) She alleges that "July 7, 2008 marks the date that the Plaintiff learned of the FBI's involvement in maintaining records on the Plaintiff." (*Id.* at ¶ 4.)

However, courts have held that for statute of limitations purposes, "the relevant fact is not when the plaintiff first had physical possession of the particular records, but rather when he first knew of the existence of the records." *Diliberti v. U.S.*, 817 F.2d 1259, 1262–63 (7th Cir. 1987); *see also Ertell v. Dep't of the Army*, 626 F. Supp. 903, 908 (C.D. Ill. 1986). In this case, filings in *Shearson I* demonstrate that Plaintiff should have known of alleged violations as early as 2006. The *Shearson I* filings are matters of public record, and Plaintiff referenced the lawsuit in her complaint. *See Jackson*, 194 F.3d at 745. In *Shearson I*, Plaintiff brought suit under the Privacy Act, alleging that "DHS/CBP may have violated the 'routine use' provision of the Privacy Act by definition and in that its sharing of information with the TSC is not properly documented." *Shearson I*, Plaintiff's

Mem. in Opp. to Summary Judgment, p. 68 (Doc. 23-1) (filed December 21, 2006). Indeed, in 2006, Plaintiff argued that records from the TSC should be searched because,

> It is evident that DHS and others, through its agency's role at the Terrorism Screening Center [TSC], maintains "records" above and beyond what is held by CBP through [Interagency Border Inspection System] and TECS . . . [and] it is clear that DHS staff are actually detailed to the Terrorism Screening Center (TSC) whose mission it is to maintain some of the records the Plaintiff is seeking, records which it now seems are most likely to have been exchanged between DHS/CBP and the TSC, which is overseen by the FBI along with the DHS.

*Id.* at 26; *see also Shearson I*, Defendants' Motion for Summary Judgment, p. 1 (Doc. 18) (filed October 6, 2006) (stating that "[d]uring primary inspection, a name query of Ms. Shearson resulted in a TECS hit for being a suspected terrorist"). Thus, by this point in 2006, Plaintiff should have known of possible violations of the Act by the FBI and therefore should have brought her claims within the year 2008. *See Villescas v. Richardson*, 124 F. Supp. 2d 647, 659 (D. Colo. 2000) (statute of limitations began to run when plaintiff received declaration in another lawsuit describing disclosure of records, even though he did not receive actual documents); *Mangino v. Dep't of Army*, 818 F. Supp. 1432, 1437 (D. Kan. 1993) ("Although plaintiff may not have known for certain the identity of the sources developed in the security clearance investigation, he clearly had sufficient knowledge to put him on notice that an error or errors may have existed in his military records.") Because the court finds that Plaintiff's claims are time barred, it need not reach the merits of Defendants' *res judicata* argument

### 3. Failure to State a Claim Under the Privacy Act

Even if Plaintiff's claims are properly before the court, Plaintiff has nevertheless failed to state a claim upon which relief can be granted. First, Plaintiff alleges that records of her "travel and

First Amendment protected activities were maintained in violation of 5 U.S.C. § 552a(e)(7)" (Am. Compl., ¶ 65), which prohibits agencies from maintaining records describing an individuals' exercise of his or her First Amendment rights. However, in her Complaint, Plaintiff fails to identify any record maintained by the Defendant that would fall within the prohibition at 5 U.S.C. § 552a(e)(7), and thus the court finds that Plaintiff has failed to state a claim for improper maintenance under § 552a(e)(7). *See Falwell v. Exec. Office of the President*, 158 F. Supp. 2d 734, 742 (W.D. Va. 2001) ("In his complaint, Falwell did not allege what records violate § 552a(e)(7).")

Second, Plaintiff's claim that the "FBI via the TSC" has improperly disseminated records about her in violation of the Privacy Act is also not cognizable because the information allegedly disclosed falls within a "routine use" exception to the Privacy Act. 5 U.S.C. §§ 552a(b)(3), (e)(4). A "routine use" is defined as the use of a record "for a purpose which is compatible with the purpose for which it is collected." 5 U.S.C. § 552a(a)(7). The Privacy Act requires an agency to publish "routine uses" of its Privacy Act systems of records in the Federal Register. 5 U.S.C. § 552a(e)(4). Pursuant to this requirement, FBI/TSC published routine uses that allow for the sort of disclosure that has been alleged to have occurred here, i.e, dissemination of watchlist information to CBP officers to facilitate their border security responsibilities. *See* 70 Fed. Reg. 43715-01, 43717 (defining routine use of records maintained in the TSDB to include disclosure of information to other federal, state, or local agencies or other organizations engaged in terrorist screening).

Because Plaintiff's improper dissemination claim falls within the cited routine uses, and are thus permissible under the Privacy Act, Plaintiff has failed to state a claim for improper dissemination. *See Mangino v. Dep't of the Army*, 1994 WL 477260, at *6 (D. Kan. Aug. 24, 1994) (Rule 12(b)(6) dismissal of claim for disclosure of records pertaining to plaintiff's challenged security clearance that fell within the agency's prescribed routine uses); *Jackson v. FBI*, 2007 WL

2492069, at *8–*9 (N.D. Ill. Aug. 28, 2007) (Rule 12(b)(6) dismissal of claims that U.S. Attorney's Office improperly disclosed plaintiff's special agent application which was covered by agency's routine uses).

Lastly, in order to obtain damages for an agency's improper maintenance or disclosure of records, as Plaintiff seeks to do here, she must establish that Defendants intentionally or willfully maintained or disclosed these records in violation of the Act, and that this conduct had an adverse effect on her, causing her actual damages. *See* 5 U.S.C. §§ 552a(g)(1)(C)–(D), (g)(4)(A). Under Sixth Circuit precedent, the "intentional" or "willful" standard is "somewhat greater than gross negligence- either by committing the act without grounds for believing it to be lawful, or flagrantly disregarding others' rights under the [Privacy] Act." *Beaven v. United States Dep't of Justice*, 622 F.3d 540, 549 (6th Cir 2010) (quotations omitted). This standard is high, reserving "civil liability only for those lapses which constituted an extraordinary departure from standards of reasonable conduct." *Kostyu v. United States*, 742 F. Supp. 413, 417 (E.D. Mich. 1990).

Here, Plaintiff makes no allegation from which one could reasonably infer that the FBI or TSC maintained or disclosed records relating to her watchlist status in flagrant disregard of her rights under the Privacy Act or without grounds for believing such actions to be lawful. Accordingly, Plaintiff has failed to state a claim for damages under the Privacy Act.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted.  (ECF No. 20.) Under the circumstances of the case, Plaintiff has failed to exhaust her remedies under Count II and therefore the court dismisses this claim without prejudice. On Counts One, Three, and Four, Plaintiff has failed to state a claim upon which relief can be granted. Finally, Plaintiff is barred from

bringing Count Five, violation of the Privacy Act, because the statute of limitations has expired for this claim.

IT IS SO ORDERED.

/s/ *SOLOMON OLIVER, JR.*
CHIEF JUDGE
UNITED STATES DISTRICT COURT

September 8, 2011